IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**FILED**
**December 6, 2024**
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**RONALD E.,**
**Respondent Below, Petitioner**

**v.) No. 24-ICA-165**     (Fam. Ct. Jefferson Cnty. Case No. FC-19-2023-D-13)

**KELLI E.,**
**Petitioner Below, Respondent**


## MEMORANDUM DECISION

Petitioner Ronald E.[1] appeals the Family Court of Jefferson County's March 14, 2024, final custody order denying him 50-50 custody of the parties' children. Respondent Kelli E. responded in support of the family court's decision.[2] Ronald E. did not file a reply.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the family court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

This Court previously addressed multiple underlying issues in this case in a previous appeal.[3] Because that decision contains detailed factual recitations, we only need to briefly discuss the facts of the case in this decision.

Ronald E. ("Father") and Kelli E. ("Mother"), recently divorced, share three children, born in 2017, 2019, and 2020. The first hearing in this matter was held on April 6, 2023. The status order from that hearing was entered on April 24, 2023, and allocated 50-50 custody and joint decision-making between the parties. Specifically, Father had

---

[1] To protect the confidentiality of the juveniles involved in this case, we refer to the parties' last name by the first initial. *See, e.g.*, W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Ronald E. is represented by Christopher D. Pence, Esq., Michael W. Taylor, Esq., and Anna L. Adkins, Esq. Kelli E. is represented by Gregory A. Bailey, Esq., and Cameron T. LeFevre, Esq.

[3] *See Ronald E. v. Kelli E.*, No. 23-ICA-528, 2024 WL 3588369 (W. Va. Ct. App. July 30, 2024) (memorandum decision).

parenting time on Monday and Tuesday, Mother had parenting time on Wednesday and Thursday, and the parties alternated Friday through Sunday. Father was ordered to pay $968 total per month in child support, and $3,000 per month in spousal support, based, in part, on the family court's determination that his income was $187,000 per year.

Father filed a motion for temporary relief on May 26, 2023, requesting that Mother's spousal support be reduced because he claimed that Mother had additional income that she failed to report to the court. In his motion, Father also requested more than 50-50 parenting time, arguing that (1) Mother lived with her parents where numerous firearms were openly present and that the house was not safe; (2) the children's internet usage was not monitored; (3) the youngest child was exposed to whiskey; (4) Mother admitted to smacking the children; (5) Mother refused to allow the children to call Father during her parenting time; and (6) Mother and her family told the children that they do not have Father's last name.

The next hearing was held on June 8, 2023. At that hearing the family court ordered the parties to use AppClose and appointed a guardian ad litem ("GAL") for the children.[4] The GAL filed her preliminary report on July 11, 2023, noting that Father was a medically discharged Marine, worked full time as an intelligence analyst, and that he slept in the basement during the marriage because Mother complained that he slept with a loaded gun near the nightstand. The GAL further noted that Father seemed hypervigilant about his children's safety, even for common activities. As for Mother, the GAL noted in her report that Mother worked part-time as a nurse, was the only disciplinarian in the home, and that the parties were unable to resolve anything together. The GAL recommended that the court's 50-50 schedule remain in place through her further investigation.

On August 23, 2023, Father filed a Domestic Violence Petition ("DVP") against Mother for allegedly striking the children on their heads, backs, arms, and buttocks. The family court dismissed the DVP because it was not signed by the magistrate.

Mother then filed in family court a motion for emergency ex parte relief on August 23, 2023, alleging that Father had made false allegations of abuse and neglect to Child Protective Services ("CPS") twice, which resulted in the children being ordered to remain with Father the day before they were to be returned to Mother, that Father had been taking nude photographs of the children in his search for marks or bruises, and that Father caused the oldest child to miss her first day of kindergarten because she was being interviewed by CPS. Mother further alleged in her emergency motion that Father had service-related mental health issues and should undergo a full mental health evaluation and requested sole custody of the children. On the same day, the family court entered a temporary ex parte order granting Mother's request for emergency custody of the children. However, by order

---

[4] AppClose is a communication app that family courts often require co-parenting parties to utilize to aid in their communication.

entered October 19, 2023, the family court denied Mother's August 23, 2023, motion and vacated the temporary ex parte order.

On August 24, 2023, Father filed a motion to invoke Rule 48 of the Rules of Practice and Procedure for Family Court and Rule 16a of the Rules of Practice and Procedure for Domestic Violence.[5] In his motion, Father stated that, due to marks on the oldest child's buttocks, he took her to the emergency room and sent pictures of the marks to the GAL.

On October 19, 2023, the GAL filed an updated report. In her report, she noted that Mother had not been permitted to have a bank account of her own during the marriage, Father engaged in extensive gaslighting of Mother, and that nothing Mother did was ever good enough for Father. The GAL further noted that Father used a video camera to show Mother that she was inept at daily chores and constantly reminded Mother that he did everything better than she. The GAL stated that Father had multiple recording devices in and outside of the home to monitor Mother's activities and that he invaded her personal laptop and cellphone. Father also tried to turn the *au pair* he hired to babysit the children against Mother. The *au pair* became concerned about Father's negative feelings for Mother and contacted Mother to express her concerns. Father then fired the *au pair* and lied to her employment agency by stating that the *au pair* stole money from him. Additionally, the GAL reported that the children's school informed her that the children were very tired at school during their time with Father, the children were asking to spend less time with him, and that he told Mother during drop-off on the first day of school, "ABCDEF-you." Based on those observations, the GAL recommended that Father have parenting time from Friday until Monday, and once per month Mother's time would extend into Saturday. A temporary custody hearing was held on October 24, 2023, during which the GAL expressed her concerns. However, both parties agreed that the current 50-50 parenting schedule should remain in place. Therefore, the family court kept custody at 50-50.

On October 23, 2023, Father filed a petition for contempt against Mother for contacting his *au pair*.[6] On November 14, 2023, Father filed a motion for ex parte temporary relief against Mother due to marks on the youngest child's buttocks. Mother's counsel filed a letter stating objections to conducting an ex parte hearing on Father's allegations. On November 29, 2023, the GAL filed a motion for Father to undergo a psychiatric evaluation and parenting assessment, or, alternatively, for the court to conduct an in camera interview with the children with the GAL present due to Father's constant

---

[5] Both rules address reports of child abuse and neglect disclosed during family court proceedings, and state that, if a family court has reasonable cause to suspect a child has been abused or neglected, the court is required to contact Child Protective Services and the circuit court.

[6] The October 19, 2023, order denying Mother's motion for ex parte relief instructed that no one was to contact or attempt to find the *au pair*.

false allegations against Mother. On January 17, 2024, Father filed a motion to enroll the children in therapy.

The final custody hearing began on January 17, 2024. At that hearing, the family court noted Father's continual obsession with creating an evidentiary scenario wherein Mother is found to be physically abusive to the children, and that such obsession resulted in inappropriate photographs of the children, alleging abuse at the hospital where Mother works, and subjecting the children to forensic exams and CPS interviews. Because none of the allegations were substantiated, the family court suspended all of Father's parenting time by order entered on January 29, 2024, and scheduled the remainder of the hearing for February 2, 2024.

On January 29, 2024, Father filed a writ of mandamus, writ of prohibition, and emergency application for a stay in circuit court, seeking relief from the family court's order suspending his parenting time. Specifically, he requested that the family court judge be ordered to report the suspected abuse to circuit court and CPS, and to conduct hearings on Father's ex parte filings and DVP.[7]

On January 30, 2024, the GAL filed a motion to withdraw, stating that due to Father's constant filings and because the case has been open for so long, it is affecting her ability to do her job. She also stated that she believes Father will continue litigating until the children reach the age of majority. On that same date, Father filed a motion to remove the GAL.

On January 30, 2024, the GAL filed her final report. In her report, she stated that someone filed a third CPS complaint against Mother alleging that she uses drugs. Father denied contacting CPS, but the GAL stated that it is evident that someone close to the case filed the complaint. The GAL also noted that the girls still complain that Father makes them sleep in his bed even though they do not want to. The children's school reported to the GAL that there were no signs of abuse from Mother and noted that Father was difficult to deal with. The GAL further stated that Father has told school personnel, other parents, and numerous people that Mother is abusive. Additionally, Father would not allow the children to participate in cheerleading because Mother was the one who signed them up. The oldest child asked to speak with the GAL to let her know that she was tired of people asking her if "mommy was mean to them." The child advised the GAL that every time she would visit Father, he would inquire about what she did at Mother's house and record her. The GAL further noted that Father went from reporting allegations of abuse to directly confronting the children in an effort to get them to accuse their mother of abuse. Therefore, the GAL recommended that Father have limited contact with the children until he is evaluated by a psychiatric professional and that Mother have sole decision-making authority.

---

[7] It is unclear from the file whether an order has been entered by the circuit court on these issues.

The remainder of the final custody hearing was held on February 2, 2024. The final order was entered on March 14, 2024, and included the following findings of fact, among many others:

1. Soon after the divorce was filed, Father began making allegations of abuse and neglect against Mother, stating that Mother was incapable of caring for the children, violent, and prone to blackouts.
2. The GAL believed Father's accusations were false because no issues were raised during the marriage when Mother was a stay-at-home mom.
3. The GAL discovered that Father had extensive recording devices in the home and accessed Mother's personal laptop and cell phone.
4. Father took the oldest child to be examined after finding marks on her body even though the child repeatedly stated that she did not know how the marks got there.
5. The GAL found that Father's behavior was becoming more and more desperate and that his behavior was an effort to gain full custody and control of the children.
6. Father took inappropriate pictures of the children in his search for marks on their bodies after they spent time with Mother.
7. Father's *au pair* informed the GAL that the children asked her to make Father stop photographing them.
8. Father's *au pair* reported to the GAL that she no longer felt safe in Father's home and that she believed Father was tracking her private text conversations.
9. The oldest child's teacher and guidance counselor informed the GAL that the child stated she did not want to go to Father's house and that she struggled emotionally on Father's parenting days.
10. The two oldest children were made to sleep in Father's bed despite wanting to sleep in their own beds.
11. All of Father's allegations of abuse by Mother to CPS were unsubstantiated.
12. The mental and emotional health of the children had "deteriorated substantially" and was continuing to deteriorate due to Father's psychologically abusive behavior.
13. The oldest child specifically asked to speak to her school guidance counselor, the GAL, or the family court judge to express her feelings.
14. Father has unnecessarily subjected the children to visits to medical providers, hospitals, forensic examinations, interviews, and allegations that their mother is abusing them.
15. It was in the best interest of the children to suspend Father's parenting time at the January 17, 2024, hearing. The next day, on January 18, 2024, Father demonstrated that he would not cease his pattern of making false allegations and met with a CPS worker to make additional allegations against Mother.
16. Father is incapable of coparenting with Mother, as demonstrated through his actions.

17. The children have never made a disclosure that Mother has hurt them and they continually stated that they desire to be with Mother and spend less time with Father.
18. Father's credibility is poor at best.
19. After the oldest child began to speak out about Father telling lies about her mother, Father began to allege abuse by Mother against the youngest child, who is too young to deny the allegations.
20. Father has engaged in conduct described in West Virginia Code § 48-9-209(a)(5) (2022), as he made one or more fraudulent reports of domestic violence or child abuse.

Based on the extensive findings, the family court ordered Father to do the following: (1) demonstrate that he has undergone a psychological evaluation and parental capacity assessment and produce said report to the court; (2) not exercise any overnight custodial time with the children; and (3) have supervised visits with the children once a week for a two-hour period, to be supervised by a licensed therapist or agency. Mother was granted sole parenting and decision-making authority. Father was ordered to pay $2,211.00 per month in child support. It is from the March 14, 2024, final order that Father now appeals.

For these matters, we are guided by the following standard of review:

When a final order of a family court is appealed to the Intermediate Court of Appeals of West Virginia, the Intermediate Court of Appeals shall review the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Intermediate Court of Appeals shall review questions of law de novo.

Syl. Pt. 2, *Christopher P. v. Amanda C.*, 250 W. Va. 53, 902 S.E.2d 185 (2024); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate court review of family court orders).

Father raises seven assignments of error on appeal. Several assignments of error are closely related, which we will consolidate. *See generally Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (allowing consolidation of related assignments of error).

In Father's first, second, third, and fourth assignments of error, he asserts that the family court erred when it made findings of fact against the preponderance of the evidence, deviated from 50-50 custody and decision-making without sufficient evidence of limiting factors, and failed to include adequate findings of fact and conclusions of law. We disagree. Upon our review of the record, the evidence supports the family court's finding that Father made multiple false reports of abuse against Mother, none of which were substantiated by law enforcement, CPS, or medical professionals. Additionally, Father's *au pair*, the GAL,

6

and school officials offered independent evidence that Father's behavior was causing undue anxiety for the children. This evidence demonstrates that the family court's findings were both supported and not clearly erroneous.

Father's argument that the family court erroneously deviated from 50-50 custody and decision-making without sufficient evidence of limiting factors and failed to include adequate findings of fact and conclusions of law is without merit. West Virginia Code § 48-9-206(d) (2022) states, "[t]he court's order determining allocation of custodial responsibility shall be in writing, and include specific findings of fact and conclusions of law supporting the determination." West Virginia Code § 48-9-209 (2024) provides a list of factors to be considered when making custody allocation findings. West Virginia Code §49-9-209(b) expressly provides, "[i]f a parent [. . .] is found to have engaged in [fraudulent reports of child abuse] the court shall impose limits that are reasonably calculated to protect the child[ren] [. . .] from harm." The limitations referenced in this code section include the options of granting sole custody to one parent and/or supervised visitation to the parent who committed the limiting factor. In this case, the family court's order contains more than one hundred findings of fact stated throughout eighteen pages. The order properly acknowledges the 50-50 presumption and the application of West Virginia Code § 48-9-209(a)(5) to the facts warranting a finding that the presumption is rebutted in this case. Accordingly, the family court was within its authority to grant Father only supervised parenting time and it included specific findings of fact and conclusions of law supporting its determination.

In his fifth assignment of error, Father contends that the family court erred in conducting the final hearing without requiring the GAL to produce her final report along with the information that is statutorily required. We disagree. West Virginia Code § 48-9-301(c) (2021) states,

> [t]he investigator shall deliver the investigator's report to counsel and to any party not represented by counsel at least 10 days prior to the hearing unless a shorter time is ordered by the court for good cause shown; *Provided*, That in no event shall the hearing take place until after the report has been provided to the parties and the completion of any discovery requested thereupon.

While the GAL failed to provide her report at least ten days in advance, it was provided prior to the hearing, and the GAL was subjected to extensive cross-examination throughout the litigation process. Regardless of when the report was filed, the record still reflects that Father filed approximately seven false reports of child abuse against Mother that were unsubstantiated. The GAL's October 19, 2023, updated report alone would have been sufficient to warrant a finding that the 50-50 presumption had been rebutted to justify limits on Father's parenting time. Therefore, we find no basis in law to warrant relief for this assignment of error.

7

In his sixth assignment of error, Father argues that the family court erred in refusing to report allegations of abuse or neglect to the circuit court pursuant to Rule 48 of the Rules of Practice and Procedure for Family Court. We disagree. Rule 48 states,

> [i]f a family court has reasonable cause to suspect any minor child involved in family court proceedings has been abused or neglected, that family court shall immediately report the suspected abuse or neglect to the state child protective services agency, pursuant to W. Va. Code §§ 49-6A-2, and the circuit court.

Here, the family court had the discretion to determine whether the reports of abuse produced reasonable cause to suspect abuse or neglect. *See State v. Guthrie*, 194 W. Va. 657, 669 n.9, 461 S.E.2d 163, 175 n.9 (1995) ("[A]n appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact."). *See also In re Tiffany Marie S.*, 196 W. Va. 223, 231, 470 S.E.2d 177, 185 (1996) (A reviewing court may not overturn a family court's finding simply because it would have decided the case differently). We find that the family court did not abuse its discretion in this regard.

Lastly, as his seventh assignment of error, Father asserts that the family court was clearly erroneous in determining his income when calculating child support. Specifically, Father contends that the court's determination was $30,000 higher than his actual income. We disagree. Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure requires, in relevant part, that "[t]he argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal." Here, Father cites to no portion of the record in support of his claim. As such, we find no basis in law to warrant relief.

Accordingly, we affirm the family court's March 14, 2024, final order.

Affirmed.

**ISSUED:** December 6, 2024

**CONCURRED IN BY:**

Chief Judge Thomas E. Scarr
Judge Charles O. Lorensen
Judge Daniel W. Greear